HORACE PARTRIDGE AND ANOTHER vs. LAWSON J. WOODING
AND ANOTHER.

*A*, owning a clock factory and machinery, entered into an arrangement with *B*
*& C* by which they were to occupy at an agreed rent so much of the factory
as was necessary for manufacturing clocks and to have the use of the
machinery, and were to make for him at their own expense all the clocks that
he should order, making none for other parties, which clocks were to be boxed
and set aside for him, and paid for as thus set aside, and which were to remain
in the factory until forwarded by his order to purchasers. A quantity of
clocks, made for *A*, were thus boxed, and placed in a room of the factory,
where they remained over two years. Held that they were to be regarded as
during this time, in the possession of *A*.

The firm of *B & C* was dissolved while the clocks were thus stored in the factory,
and the factory was unoccupied for two months, at the end of which time *C*
went into partnership with *D* and the new firm took the factory of *A* on the
same terms. This firm was soon after dissolved and *C* went on alone under
the same arrangement. While *C* was thus occupying, the clocks in question
were attached by one of his creditors. Held that, upon the dissolution of the
firm of *B & C* and the closing of the factory, any possession that they might
be regarded as having had terminated, and that the new arrangement made
with *C & D* did not operate to take the possession from *A*.

Even if the possession were to be regarded as retained by *B & C* and afterwards
by *C* alone, the creditors of *C* could attach only his interest in the property.

TRESPASS for taking and carrying away a quantity of clocks;
brought to the Court of Common Pleas of Hartford County.
The case was tried to the court upon the general issue, with
notice that the defendants would show that the clocks were
attached as the property of one Charles Lewis, by the defend-
ant Foley, as a deputy sheriff, upon a writ in favor of the
defendant Wooding, in a suit against the said Lewis. The
court found the following facts:—

Previous to January 1, 1875, the plaintiff Partridge was
engaged in the business of selling clocks in Boston in the state
of Massachusetts, and had been in the business for many
years. On that day Benjamin F. Hunt, the other plaintiff,
went into partnership with him in the same business under
the name of Horace Partridge & Company, and all the rights
of Partridge under the contracts hereinafter stated became
at that time vested in, and have ever since been the property

of, the firm.   Partridge is, and for many years has been, the owner in fee of a building in Bristol, Connecticut, with machinery therein, suitable for the manufacture of clocks. In 1866 he began the manufacture of clocks at this factory, with workmen and a superintendent employed by him.   About 1868 he made arrangements with certain parties, giving them the use of the machinery, and as much as they would need of the factory for the manufacture of clocks; he to take all the clocks when completed, at a price agreed on.   This arrangement continued until after 1873.   In the fall of 1871 B. B. Lewis and Charles S. Lewis, under the firm of B. B. Lewis & Son, took the factory and occupied it until January 1, 1873, under a verbal contract with Partridge that they should make for him such clocks as he should order, at an agreed price per clock; they to hire help and furnish materials, to repair the machinery at their own expense, and to pay a certain agreed rent for the factory.   All the clocks when finished were to be packed in cases, and the cases to remain in the factory, to be shipped thence as Partridge should order.   B. B. Lewis & Son drew their pay from Partridge as fast as they completed and boxed the clocks ordered from time to time, their custom being to draw on him for the amount due for each lot as fast as completed.   They were obliged to keep the clocks in the factory for him, until shipped by his order to purchasers, but no special portion of the factory was set apart for that purpose.   He always kept the clocks so finished and paid for, insured. . B. B. Lewis & Son never claimed to own or control the clocks thus boxed and stored for him, but did own all work and materials until so finished, boxed and paid for. This arrangement was made and acted on in good faith by Partridge and B. B. Lewis & Son, and was of great convenience to him, and was generally known to the employees in the factory.   The clocks mentioned in the plaintiffs' writ were made by B. B. Lewis & Son, and paid for by Partridge in conformity with the above arrangement prior to January 1st, 1873.

Partridge was accustomed to furnish B. B. Lewis & Son with labels containing his name and address in Boston,

describing him as a manufacturer and dealer in clocks, to be pasted in the inside of all clocks when completed. None of the clocks mentioned in the plaintiffs' writ were provided with these labels, the supply having been exhausted at the time they were finished and cased. The factory had two floors besides the attic. The upper floor was mostly used for work, the attic was used for storing odds and ends, and also for storing clocks finished and paid for, awaiting Partridge's order for delivery to his customers. The lower floor had a room partitioned off for setting up clocks, and a saw room. The space between these was occupied by the main entrance to the building, by a planer and other machinery, and for storing finished and unfinished work, and there were workmen engaged in this part of the building the greater portion of the time. There were always some cases of clocks finished and paid for, kept in this part of the building awaiting Partridge's orders for shipment. The "No. 3," so called, were slow of sale, and those described in the writ were of this kind, and besides these several hundred No. 3 clocks remained in the factory on the 1st of January, 1873, and afterwards.

B. B. Lewis & Son dissolved January 1st, 1873, and for several weeks thereafter Charles S. Lewis, one of that firm, by Partridge's request kept the key, took care of the building, and did work there for himself as he desired. In March, 1873, Charles S. Lewis associated with two other men under the firm name of C. S. Lewis & Co., and occupied the factory under substantially the same arrangement as the former one, with a slight difference in the price of the clocks, and permission from Partridge to do any work for other parties, except making clocks, provided they would supply Partridge with all that he should order. These parties dropped out of the firm before October, 1874, after which date C. S. Lewis continued to carry on the manufacture until the date of the alleged trespass complained of by the plaintiffs. There were no No. 3 clocks made after January 1, 1873. They were always kept on the lower floor, in the space between the saw room and setting up room; but were removed to different places therein, from time to time, by C. S. Lewis & Co., for their convenience;

and in August, 1875, there were in this space several cases of finished clocks that were not paid for by Partridge or the plaintiffs, and were the property of C. S. Lewis, some cases of railroad indicators, also Lewis's property, and several cases of No. 3 clocks, all of which had been finished and paid for by Partridge before January 1, 1873, and were awaiting his orders for shipment. There were no exterior marks on the cases of No. 3s to indicate whose property they were, and it never had been the custom to put any marks on the cases until shipment. C. S. Lewis had been for some time harassed by creditors, and had offered to give, and in many instances did give, clocks in payment for his bills, making no stipulated exceptions of the No. 3s, and had repeatedly offered to pay the defendant Wooding in the same manner, but in no case did Lewis actually deliver any No. 3s to such creditors excepting in one instance, where the clocks were delivered by the mistake of an employee, which was immediately rectified by Lewis, who supplied the deficient case, which was some time before the trespass complained of.

Lewis had at various times traded clocks for material, and for a horse and wagon, and used them in paying his employees, but in no case with the knowledge or consent of the plaintiffs, nor did he so dispose of any that had been paid for by the plaintiffs.

Wooding had a lawful claim of $94.30 against C. S. Lewis, and sued for the same in August, 1875, the defendant Foley, a deputy sheriff, serving the writ. The defendants went to the factory, and Davis, an employee, pointed out cases containing two hundred and sixteen No. 3 clocks, and informed the defendants that they belonged to C. S. Lewis. Davis knew at the time that they had been paid for by Partridge. Foley was about to attach cases of unfinished clocks that were the property of Lewis, but Davis represented to the defendants that if they left the unfinished work the workmen of Lewis would have security thereon for their wages. Lewis was not present at the time. There was then property of Lewis's in the factory which was of as great value as the clocks attached. The clocks were worth $216. Foley in

good faith attached them, supposing them to be Lewis's property, and they were sold by him on an execution in the Wooding suit. The defendants were notified by the plaintiffs before the levy of the execution that the clocks were their property, and demand was made of them therefor and refused.

Upon these facts the case was reserved for the advice of this court.

*G. A. Gowdy* for the plaintiffs.

1. Upon the facts as found the occupants of the factory were making clocks as the agents of the plaintiffs. They were to use the machinery and as much of the factory as they would need for the manufacture. The clocks when made were to be packed in boxes and were to remain on storage until the plaintiffs should order them to be shipped. The Lewises were to make such clocks as the plaintiffs should order, and make none for other parties; the plaintiffs always kept the clocks so finished insured; the Lewises never claimed to own them; and the labels supplied by the plaintiffs to be put upon the clocks described the plaintiffs as manufacturers of clocks. These facts clearly constitute an agency on the part of the Lewises. It does not alter the case that they were to hire their own help, furnish material and pay rent. These are incidents of the arrangement that are not necessarily inconsistent with the agency.

2. The clocks attached were made for the plaintiffs by the firm of B. B. Lewis & Son. If they remained as to creditors the property of the firm, by reason of want of delivery, yet it was only as property of the firm, and the private interest of one of the partners would be only his share of the surplus after the partnership debts were paid. The officer did not attach the interest of C. S. Lewis in the clocks, but took them as the property of Lewis and sold them bodily. This he could not do. *Brewster* v. *Hammett,* 4 Conn., 540; *Barber* v. *Hartford Bank,* 9 id., 410; *Filley* v. *Phelps,* 18 id., 300.

3. But in any view of the relation of the Lewises to the plaintiffs, there was a sufficient delivery of the clocks, and they were when attached in the possession of the plaintiffs.

By the terms of the contract the plaintiffs reserved storage room enough for the clocks made for them, which storage room they were at liberty to use as long as they pleased. No more of the factory was leased to the Lewises than was needed for manufacturing the clocks. The rest remained under the control of the plaintiffs. The clocks therefore, when so stored, were delivered to them, and while on storage were in their possession. *Potter* v. *Payne*, 21 Conn., 362; *Potter* v. *Mather*, 24 id., 554; *Bird* v. *Andrews*, 40 id., 542.

*S. P. Newell*, for the defendants.

1. Possession by the vendor is not merely evidence of fraud, but is fraud in law. This court has said, in the case of *Hatstat* v. *Blakeslee*, 41 Conn., 302, "Purchasers must learn and understand that if they purchase property, and without a legal excuse permit the possession to remain in fact or *apparently* and *visibly* the same as before the sale, they hazard its loss by attachment for the debts of the vendor as still his property."

2. There was no actual delivery into any place set apart as the plaintiffs' warehouse. They had no right to any specific part of the factory, or the exclusive possession of any part. These goods were with C. S. Lewis's own goods in the room that Lewis used every day in manufacturing and storing his own goods. There were no marks upon the goods attached to distinguish them from the goods confessedly his. The interval between the firms of B. B. Lewis & Son, and C. S. Lewis & Co. and C. S. Lewis, does not affect the question. The factory remained in the possession of C. S. Lewis, who was the managing member of both firms, and at the time of the attachment was the sole proprietor of the factory. Nor, for the same reason, does the change of firms affect the question. The mischief is that the apparent control is the same in both cases. If anything that took place can be considered a delivery, there was certainly a re-delivery, by the consent and by the express stipulation of the plaintiffs. A re-delivery is as bad as an original retention of possession. *Norton* v. *Doolittle*, 32 Conn., 405. The fact that the goods were left

for a special purpose, and not for the vendor's benefit, is of no consequence. *Carter* v. *Watkins*, 14 Conn., 243; *Hall* v. *Gaylor*, 37 id., 553.

3. The defendants did not know of the sale to Partridge, but supposed the goods to be Lewis's. They had no reason to know. They were piled with Lewis's goods, in the same sort of boxes. Other boxes of goods from the same pile had been turned out to various creditors of Lewis. Lewis had offered to pay Wooding in clocks, not specifying any particular clocks. Davis, an employee of Lewis, said they were Lewis's clocks. Lewis had sold clocks whenever he had an opportunity to do so, traded them for materials, and paid workmen with them. If the defendants had known of the sale it would have made no difference. *Swift* v. *Thompson*, 9 Conn., 70; *Couch* v. *Carrier*, 16 id., 507. Hence the evidence of workmen's knowledge was inadmissible.

4. There is nothing in the relation of the parties to prevent the application of the general rule. 1st. The fact that the relation of landlord and tenant existed between them is of no consequence. 2d. The Lewises were not Partridge's agents. He tried manufacturing by agents in 1866, and soon abandoned it. They bought the stock, and paid the men, and paid rent for the factory. It is admitted on all hands that the clocks were theirs till boxed. This is totally inconsistent with the idea of agency. They had the right to make other goods. No business of any kind was done in the factory except this business of Lewis's. Partridge resided and carried on business in Boston, and was not personally present at the factory. 3d. They did make, sell, and otherwise dispose of clocks as they pleased. It is not an uncommon thing for manufacturers to sell exclusively to one merchant, but this does not in any way change their relation. Not even if the goods are manufactured on his orders. *Carter* v. *Watkins*, 14 Conn., 243, is conclusive on this point. The combs in that case were made on an order. That case is even stronger than this.

PARK, C. J. If two persons own personal property jointly,

and sell it to another in good faith, for a valuable considera-
tion, and are suffered to retain possession of it, a creditor of
one of them can disturb the sale only to the extent of that
one's interest in the property at the time of the sale.   So far
he can treat the property as though it had never been sold.
But the fact that there has been a retention of the possession
of the property does not enlarge his right, so that he can
attach more of the property than his debtor ever owned.   He
may take his debtor's former interest, but he must be satisfied
with that.

No one will question the soundness of this doctrine.
Applying it to the case in hand, it seems to be clear that,
however else the case may be viewed, the defendants had no
right to attach this property, so far as it was acquired by the
plaintiffs from B. B. Lewis.   The clocks were manufactured
by B. B. Lewis and C. S. Lewis as partners.   They jointly
owned the property; the plaintiffs paid them jointly for it;
and it is clear that Wooding, as a creditor of C. S. Lewis
alone, had no right to attach the interest in the property which
had before the sale belonged to B. B. Lewis.   In any view of
the case, therefore, his right to the property must be confined
to the share of C. S. Lewis at the time of the sale.

But had the defendants the right to attach the property at
all ?   The clocks were manufactured under a contract entered
into in 1871, between Partridge, one of the plaintiffs, and the
firm of B. B. Lewis & Son, wherein it was agreed that the
firm should occupy so much of the clock factory belonging to
Partridge as should be necessary for the manufacture of
clocks, that they should furnish materials and workmen for
the purpose, and should manufacture clocks solely for Part-
ridge.   He agreed to take all the clocks manufactured by the
firm, paying a certain price for the same as fast as they
should be packed in boxes ready for the market.   He was the
owner of the establishment and of all the machinery and tools
in it, and had previously carried on the manufacturing busi-
ness himself.   The firm manufactured clocks under the con-
tract till January, 1873, when it was dissolved, and during
the time manufactured the clocks in question, and packed

them in boxes. Partridge paid for the clocks as fast as they were manufactured according to the contract; and paid for the clocks now in controversy. During this time all boxes ready for market remained in the establishment until sold by Partridge. This was done for purposes of convenience and the saving of expense. The contract terminated the first of January, 1873, at the time the partnership was dissolved. The establishment was closed till March of the same year, when C. S. Lewis formed a partnership with other persons. The new firm made a similar contract with Partridge for the occupancy of the factory and the manufacture of clocks, and went into possession of the establishment under their agreement. The firm continued to manufacture clocks till the fall of 1874, when it was dissolved, and the business was continued by C. S. Lewis under another similar arrangement with Partridge. The property in question was attached as the property of C. S. Lewis, while he was in possession of the establishment under the last agreement. These are the principal facts in the case, and on them this question must be determined.

It is to be observed that the firms of B. B. Lewis & Son and C. S. Lewis & Co. had no right under their contracts to store any goods of their own upon the premises, neither did they do so in fact. As fast as the goods were manufactured, and placed in boxes, they were to be paid for and were in fact paid for by Partridge. The same was true under the last agreement with C. S. Lewis. The firms under the first two contracts, and C. S. Lewis under the last, were merely manufacturers of goods. They were in possession of the establishment only as manufacturers, and to the extent only that was necessary to carry on the manufacturing business. Partridge was in the exclusive possession for every other purpose. It follows, therefore, that the goods in question were in the exclusive possession of Partridge from the time they were placed in boxes and paid for by him. The case is widely different from what it would have been if B. B. Lewis & Son had leased the entire establishment for the purpose of carrying on the business of manufacturing and selling clocks on their own account, and Partridge had been merely one of

Partridge *v.* Wooding.

their customers, who after buying the clocks had left them in their possession. This is the view of the case which the defendants present, and urge upon our consideration. The distinction is obvious.

Again, the firm of B. B. Lewis & Son was dissolved on the first day of January, 1873, and the establishment was closed till some time in March following. The possession of the old firm terminated with the existence of the firm. Whatever possession C. S. Lewis had of the premises, as a member of the firm, he had it jointly with B. B. Lewis. When the new firm was organized in March, and were let into another limited possession of the premises, the possession of C. S. Lewis was a joint possession with other parties under another contract. Suppose the new firm had come into possession for the sole purpose of manufacturing boots and shoes, or of carrying on the grocery or dry-goods business, and were limited in their possession to what was necessary for the purpose, would any one claim that Partridge thereby returned these goods to the possession of C. S. Lewis, simply because he with others was in the establishment manufacturing boots and shoes, any more than if he had been let into the building to extinguish a fire, or to look after the safety of the premises during a period of suspension of business? Manifestly, there was no intention to return the possession of the property. No object could have been accomplished by so doing; it could not have been used by C. S. Lewis otherwise than for purposes of sale. We think the goods were continuously in the exclusive possession of Partridge from the time they were packed in boxes and paid for by him, until Hunt his partner in January, 1875, acquired an equal interest with him, and were in the exclusive possession of the plaintiffs from that time until the attachment.

We advise judgment for the plaintiffs.

In this opinion the other judges concurred; except CARPENTER, J., who dissented.